Lawrence AGEE Plaintiff,

v.

Richard GRUNERT, M.D., Chris Fukuda, M.D., Fletcher Allen Health Care, Inc., and Copley Hospital Defendants.

No. 2:00–CV–169.

United States District Court, D. Vermont.

Oct. 1, 2004.

Lawrence C. Agee, Auburn, CA, Pro se.

Robert F. O'Neill, Esq., Burlington, VT, for Defendants.

### OPINION AND ORDER

SESSIONS, Chief Judge.

In this action, Plaintiff Lawrence Agee ("Agee"), appearing pro se, alleges defamation, restriction of trade, breach of contract, intentional infliction of emotional distress, negligent infliction of emotional distress, harassment, and violation of the Americans with Disabilities Act. Defendants Richard Grunert, M.D., ("Grunert") and Chris Fukuda, M.D., ("Fukuda") have filed for summary judgment on all claims.[1] Agee has filed a cross-motion for summary judgment on his breach of contract claim. For the reasons that follow, the Court grants the defendants' motion for summary judgment as to all remaining counts of the Amended Complaint.

### Factual Background

Agee is a physician who first received his Vermont medical license in 1984. Am. Compl. ¶ 8 (Doc. 19) (hereinafter "Compl."). In 1990, he received his board certification in the sub-specialty of Urology. *Id.* In 1995, Agee joined with Grunert and Fukuda in a group practice called Green Mountain Urology ("GMU"). *Id.* ¶ 10. Relations between the parties were cordial until May 1997 when the events at the heart of this dispute began. Pl.'s Mem. of P. & A. at 1 (Doc. 68). As of May 1997, Agee had practice privileges at Cop-

---

**1.** The Court has previously dismissed all claims against defendants Fletcher Allen Health Care, Inc. and Copley Hospital (Doc. 39).

ley Hospital ("Copley"), Gifford Hospital ("Gifford") and Fletcher Allen Health Care ("FAHC").

In May 1997, Agee came to believe that his wife, with whom he was in the midst of a divorce, had robbed his home and taken money from his bank accounts without authorization. Pl.'s Mem. of P. & A. at 1–2 (Doc. 68). On May 16, 1997, Agee asked Fukuda for assistance performing a vasectomy procedure. Proposed Pretrial Order at 2 (Doc. 70, Ex. C) (hereinafter "Pretrial Order").[2] Agee concedes that part of the reason he had difficulty with the procedure was that he was suffering from sleep deprivation and side effects of Halcion, a sleeping medication. Id. In fact, Agee concedes that he began this surgical procedure despite having barely slept at all for a full week. Fukuda Dep. at 58:21–59:7 (Doc. 70, Ex. G) (hereinafter "Fukuda").[3] Agee also expressed concerns to Fukuda that the patient, who was a nurse, had been following him around in what Agee considered unusual circumstances. Agee Aff. ¶ 8 (Doc. 75).

On May 17, one day after Agee required assistance with the vasectomy procedure, Agee became fearful that his ex-wife was going to have him arrested or killed. Pretrial Order at 2. This belief was based on Agee's interpretation of items left in his home, such as a magazine article that made reference to "dead doctors." Id.; Compl. ¶¶ 44–47; Agee Aff. ¶ 60, ¶¶ 76–77 (Doc. 75). Motivated by this fear, Agee fled from Vermont. Pretrial Order at 2–3. On May 20, Agee missed a day of work at Gifford Hospital. Id. at 2–3, 5; Compl. ¶¶ 39, 44–45. When Agee returned to Ver-

mont on Friday May 23, he explained to Fukuda and Grunert that he had been absent because he had been in fear for his life. Pretrial Order at 3; Fukuda at 43:1–25. Agee also told Fukuda and Grunert that his ex-wife had made him drink a substance that contained heavy metals. Pretrial Order at 3. Agee believed that this substance was a threat to his health and possibly even his life. Agee Aff. ¶ 60–65 (Doc. 75).

In response to Agee's claims and behavior, Fukuda and Grunert recommended to Agee that he seek medical help. Pretrial Order at 3. Agee refused to seek medical help. Id. Over the next few days the defendants tried to invoke a contractual clause in Agee's employment agreement with GMU that allowed GMU to determine if Agee had a medical disability. Id. at 3–4. Agee refused to participate in this process. Id. at 4. The employment agreement specifies that if Agee refused to participate in this process he would be determined to be disabled and placed on disability leave. Employment Agreement 1996 at 5–6 (Doc. 70, Ex. L). Faced with Agee's refusal to participate, the defendants invoked this clause. Pretrial Order at 3–4.

Defendants then contacted FAHC, Gifford and Copley and described Agee's behavior and that Agee had been placed on temporary leave from GMU. Id. at 4. They also expressed concerns about Agee's ability to practice medicine. Id. Fukada reported that Agee had said that his wife had tried to poison him and that a patient had been spying on him. Fukuda at 14–15, 33–36. As a result of these contacts,

2. This proposed order was originally prepared by the defendants. Agee inserted his own comments throughout the document. The Court relies only on allegations that were presented by Agee or were uncontested by Agee.

3. Agee appears pro se in this case and he questioned the defendants directly at their depositions. Thus, many of the Court's citations to these depositions actually refer to comments made by Agee and not to statements made by either of the defendants.

Gifford and Copley placed Agee on medical leave. *Id.*

On June 6, 1997 Agee arrived at GMU's office and asked to be reinstated. *Id.* When this request was refused, Agee resigned from GMU by walking around the office and writing "I resign" on various pieces of paper. *Id.;* Fukuda at 72:18–73:13.

In December 1997, after the defendants learned that Agee was scheduled to do a surgical procedure at FAHC, they contacted Dr. Steven Shackford at FAHC to report that Agee's medical malpractice insurance with GMU had been cancelled. Pretrial Order at 4–5. FAHC cancelled the procedure. *Id.* In the Spring of 1998, the credential committee at FAHC recommended that Agee's reappointment to the hospital staff be withheld until he undergo a mental health evaluation to determine whether he was fit to practice. *Id.* at 5. Agee refused to undergo an evaluation and appealed this decision. *Id.* at 6. The FAHC appeals committee considered this appeal in July 1999 and the committee again made Agee's reinstatement conditional on an evaluation and counseling. *Id.* As Agee continued to refuse to submit to an evaluation or to participate in counseling, his privileges at FAHC were revoked. FAHC submitted a report of this decision to the National Practitioner's Data Bank. *Id.* at 7.

The plaintiff moved to California in April 1999, intending to practice medicine there. Compl. ¶ 59. In November of 1999, the Medical Board of California learned of the FAHC proceedings concerning Agee and initiated an investigation. Proposed Order at 7. That Board suspended Agee's California medical license on August 25, 2000. *Id.* In March 2000, the State of Vermont initiated proceedings before the Board of Medical Practice seeking to suspend Agee's medical license in Vermont. (Doc. 70, Ex. Q) The Board suspended Agee's license on November 27, 2001. (Doc. 70, Ex. R).

### *Summary Judgment Standard*

Summary judgment is granted only if there is no genuine issue as to any material fact and the moving party has shown that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also N.Y. Stock Exch., Inc. v. N.Y., N.Y. Hotel LLC,* 293 F.3d 550, 554 (2d Cir.2002). The evidence is reviewed in the light most favorable to the nonmoving party, with all ambiguities resolved and all reasonable inferences drawn in its favor. *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 61 (2d Cir.2000). The moving party has the initial burden of coming forward with those parts of the record it feels demonstrate an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).

### *Discussion*

█ Fukuda and Grunert are the only remaining defendants in this lawsuit and the Court will not consider the many unrelated allegations that Agee has raised against others in his recent pleadings. Similarly, the Court will not consider legal claims raised for the first time in Agee's memorandum in opposition to the defendants' summary judgment motion. Courts should not consider new legal claims raised at such a late stage. *See, e.g., McAllister v. N.Y. City Police Dep't,* 49 F.Supp.2d 688, 697–98 (S.D.N.Y.1999) (collecting cases). Thus, the analysis here considers

only the legal claims found in Agee's Amended Complaint.

## A. Defamation

■ In Counts I and II of his Amended Complaint, Agee claims that the defendants' statements to the three hospitals were defamatory. Under Vermont law, the elements of defamation are: "(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable per se; and (6) some actual harm so as to warrant compensatory damages." *Ryan v. Herald Ass'n Inc.,* 152 Vt. 275, 277, 566 A.2d 1316, 1317 (1989) (quoting *Lent v. Huntoon,* 143 Vt. 539, 546–47, 470 A.2d 1162,. 1168 (1983)). The defendants argue that Agee cannot satisfy the first element of defamation. The Court agrees.

■ Agee claims that he was defamed when the defendants told the hospitals that he was "disabled" and had been placed on "medical disability." Compl. ¶ 16. He also claims that Fukuda and Grunert said that he was "impaired" with respect to his ability to practice medicine. Compl. ¶ 52. The undisputed facts show that Agee attempted a surgical procedure despite not having slept for days and being under the ·influence of sleep medication. Faced with this evidence, Fukuda and Grunert were not only justified to raise questions about Agee's fitness to practice medicine, they were required to under the American Medical Association's Code of Ethics. *See* Am. Med. Ass'n Code of Ethics E–9.031 (2002) (requiring doctors to report evidence of impairment among colleagues). Moreover, although Agee contests the fairness of the situation, he does not dispute that he was placed on medical disability leave by GMU. In fact, Agee had

been placed on disability leave because he had refused to participate in GMU's process for determining whether he was disabled. Under Agee's employment agreement, this refusal has the consequence that he shall "be deemed to have acquiesced in the determination of disability." Employment Agreement 1996 at 5 (Doc. 70, Ex. L). Thus, the defendants were justified when they stated that Agee had been determined to be disabled and that he was on disability leave.

■ Agee also argues that he was defamed when Fukuda told others that Agee had said that his wife had tried to poison him and that a patient had been spying on him. Agee claims that he never used the words "spying" or "poisoned." Nevertheless, the undisputed evidence shows that Agee told Fukuda that a patient had followed him around in unusual circumstances. Agee Aff. ¶ 8. Agee also told Fukuda that his wife had him drink a substance containing heavy metals and he was very concerned that this substance could harm him. *Id.* at ¶ 60–65. Thus, regardless of the exact words that Agee used to describe these events, there is no question that Fukuda accurately characterized what he had heard.

Agee also fails to satisfy the second and fourth elements of defamation. The defendants argue that statements concerning a physician made in the interests of patients and other parties should be covered by conditional privilege. Although there are no Vermont cases addressing this exact issue, it is clear that such statements are subject to conditional privilege under Vermont law.

■ The general principle of conditional privilege is outlined in the Restatement (Second) of Torts § 595(1) (1977). The Restatement suggests that a statement is privileged if: (1) it "affects a sufficiently

important interest of the recipient or a third person"; and (2) "the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct." Restatement (Second) of Torts § 595(1) (1977). The statements at issue in this case fit this paradigm perfectly. Statements concerning a physician's fitness to practice obviously affect an important interest of third persons. This is why physicians have an ethical obligation to report impairment among their fellows. See Am. Med. Ass'n Code of Ethics E–9.031 (2002). Moreover, physicians are obliged to make these reports to the hospitals where the impaired doctor practices. See id. This is exactly what the defendants did here. Thus, publication was clearly within generally accepted standards of decent conduct.

The Vermont Supreme Court followed the Restatement (Second) of Torts in recognizing conditional privilege for statements made for the protection of a lawful business interest. See Lent v. Huntoon, 143 Vt. 539, 548–49, 470 A.2d 1162, 1169 (1983). Thus, it is not difficult to conclude that the Court would also recognize a conditional privilege here. In this case, where the safety of patients is at stake, there is an even greater need for the conditional privilege.

Other courts that have considered this issue have also held that conditional privilege should apply. For example, in Marshall v. Planz, the court considered allegations that a doctor's health problems were interfering with his ability to practice. Marshall v. Planz, 13 F.Supp.2d 1246, 1252 (M.D.Ala.1998). The court found that conditional privilege should apply to such statements. See id.; see also Farooq v. Coffey, 206 A.D.2d 879, 616 N.Y.S.2d 112, 112 (4th Dep't 1994) (noting that a "quali-fied privilege extends to statements about a physician's qualifications by and/or to hospital officials").

The conditional privilege can only be defeated by a showing of malice. See Lent, 143 Vt. at 549, 470 A.2d at 1169. Malice can be inferred from a showing that the defendant either knew the statement was false or acted with reckless disregard for its truth. See id. Agee has presented no evidence that would suggest that Fukuda or Grunert acted in this way. Although Agee continues to maintain that his behavior did not indicate any impairment, this factual dispute does not raise a triable issue of fact. For the conditional privilege to apply "it is unnecessary that the interest in question be actually in need of protection ... [i]t is enough that the circumstances are such as to lead to the reasonable belief that the third person's interest is in danger." Restatement (Second) of Torts § 595 (1977) comment d. Here, Fukuda and Grunert were faced with a colleague who suggested to them that he may have consumed a toxic substance and that he was in fear of his life. Regardless of whether there was any rational basis for Agee's fears, it is undisputed that he was highly agitated by these worries. This agitation resulted in Agee performing surgery despite not having slept for days and being under the influence of sleep medication. In these circumstances, it would have been derelict for the defendants not to have reported their concerns about Agee's fitness to practice. Thus, Fukuda and Grunert are entitled to summary judgment on both Counts I and II of the Amended Complaint.

**B. Restriction of Trade**

Count III of Agee's complaint alleges "restriction of trade." Agee has not provided the Court with any legal authority showing that this is a recognizable

cause of action in Vermont. Moreover, Agee has presented no evidence suggesting that the defendants did anything other than raise legitimate concerns about his behavior. Agee is unable to practice his profession, not because of any illegitimate acts of the defendants, but because the medical boards of California and Vermont suspended his license. Thus, Fukuda and Grunert are entitled to summary judgment on Count III of the Amended Complaint.

## C. Breach of Contract

■ Both Agee and the defendants have requested summary judgment on Agee's breach of contract claim. There are no factual disputes regarding what amounts were actually paid to Agee. The parties dispute whether Agee was paid all that he was entitled to under the Stockholder's Agreement. As Agee's claim depends solely on the construction of the contractual terms, it is appropriate for the Court to decide this issue at summary judgment. *See Universal Underwriters Ins. Co. v. Allstates Air Cargo, Inc.*, 2003 Vt 8, 175 Vt. 475, 820 A.2d 988, 991 (2003) ("construction of a contract is a matter of law and not a factual determination").

■ Agee claims that GMU was required to buy back his stock and he "estimates that the value of his stock was in excess of $100,000, because the stock represented the value of his entire medical practice." Pl.'s Mem. in Opp'n at 30 (Doc. 75). Agee has provided the Court with no reason why the Court should follow his speculative "estimation" rather than the contractually agreed to method of determining the value of the stock. The defendants have provided the Court with a copy of the Stockholders Agreement and an affidavit explaining the valuation of Agee's stock under this agreement. (Doc 70, Exs. S, T). The defendants' calculations are consistent with the terms of the contract

and show a balance of $4,580 owed by Agee to GMU.

■ Agee now claims that the defendants impermissibly included an amount spent on malpractice tail coverage when they calculated what was owed to him. This allegation is not found in the Amended Complaint. Moreover, the Employment Agreement between Agee and GMU explicitly permitted GMU to deduct this expense from what was owed to Agee. Employment Agreement § 7 (Doc. 70, Ex. L).

The defendants have met their burden of coming forward with evidence demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In response, Agee has simply speculated that he was entitled to more money. This is not adequate to survive summary judgment as Agee has not "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Thus, the defendants are entitled to summary judgment on Count IV of the Amended Complaint.

## D. Intentional Infliction of Emotional Distress

■ Under Vermont law, the elements of intentional infliction of emotional distress are: (1) outrageous conduct; (2) done intentionally or with reckless disregard of the probability of causing emotional distress; (3) resulting in the suffering of extreme emotional distress; (4) actually or proximately caused by the outrageous conduct. *Fromson v. State*, 2004 Vt. 29, 848 A.2d 344, 347 (2004). Agee must show that the defendants' behavior was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community and be regarded as atrocious and utterly intolerable." *Dulude v.*

*Fletcher Allen Health Care, Inc.*, 174 Vt. 74, 83, 807 A.2d 390, 398 (2002). Agee has not presented any evidence that supports such a conclusion. Thus, the defendants are entitled to summary judgment on Count V of his Amended Complaint.

### E. Negligent Infliction of Emotional Distress

■ Agee's claim for negligent infliction of emotional distress is unsupportable. This tort requires, among other things, that the plaintiff show that "he or someone close to him faced physical peril." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 125, 730 A.2d 1086, 1092 (1999). Agee has not even alleged that Fukuda or Grunert placed him or someone close to him in physical peril. Thus, the Court must grant the defendants summary judgment on Count VI of the Amended Complaint.

### F. Harassment

■ Count VII of Agee's Amended Complaint asserts a claim of "harassment." Again, Agee has failed to provide the Court with any legal authority suggesting that "harassment" is a recognizable statutory or common law claim. Sexual harassment is actionable under federal law. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Nevertheless, Agee has not suggested that Fukuda or Grunert have committed any acts of that character. In fact, this count of the Amended Complaint does not even refer to any actions committed by Fukuda or Grunert. Fukuda and Grunert are entitled to summary judgment of Court VII of the Amended Complaint.

### G. Violation of the Americans with Disabilities Act

■ While claims under Title I of the Americans with Disabilities Act ("ADA") concerning employment can be filed in fed-eral court, resort to the Equal Employment Opportunity Commission ("EEOC") is a prerequisite to any such action. *See* 42 U.S.C.A. § 12117(a); *see also Zerilli–Edelglass v. N.Y. City Transit Auth.*, 333 F.3d 74, 76 (2d Cir.2003). Agee has made no showing that he filed a timely charge with the EEOC concerning this matter. Thus, the Court must dismiss this count.

■ Agee's ADA claim has no merit regardless of his failure to file a timely charge before the EEOC. To establish a prima facie case of disability discrimination in the employment context, Agee must show that his employer is subject to the ADA. *See, e.g., Giordano v. City of N. Y.*, 274 F.3d 740, 747 (2d Cir.2001). Agee fails this test. Partners who participate in the management of an organization are generally not employees of that organization under the ADA. *See, e.g., Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449–451, 123 S.Ct. 1673, 155 L.Ed.2d 615 (2003). Moreover, even if Agee had been an employee of GMU he was never an employee of Fukuda or Grunert. It is undisputed that they were equal partners within GMU. Compl. ¶ 10. In fact, Agee has explicitly noted that the defendants were not his employer. Agee Aff. ¶ 12. Thus, the defendants are entitled to summary judgment on Count IX of the Amended Complaint.

### Conclusion

For the foregoing reasons, the defendants' motion for summary judgment (Doc. 69) is granted and the Court finds for defendants Fukuda and Grunert on all remaining counts of Agee's Amended Complaint. Agee's cross-motion for summary judgment (Doc. 75) is denied.

Agee had filed a motion requesting the power to subpoena a bewildering array of witnesses (including a judge, an administrative law judge and a district attorney)

to appear at trial (Doc. 68). That motion is dismissed as moot.

This lawsuit is one of eleven that Agee has filed in this district premised on the circumstances of his divorce and the subsequent loss of his medical license. In December 2002, Agee was enjoined by this Court from filing any further actions stemming from this subject matter without prior authorization of a sitting judge of the United States District Court for the District of Vermont. *Agee v. State of Vermont*, No. 02–62, slip op. (D.Vt. September 17, 2001), Sessions, J. (December 5, 2002). Of the multitude of lawsuits filed before that order, this is the final action to reach resolution.

CASE CLOSED.